**The STATE ex rel. GEORGE**

v.

**INDUSTRIAL COMMISSION OF OHIO et al.**

[Cite as *State ex rel. George v. Indus. Comm.*, 193 Ohio App.3d 696, 2011-Ohio-2807.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 10AP–310.

Decided June 9, 2011.

Shapiro, Marnecheck, Reimer & Palnik, Philip A. Marnecheck and Matthew Palnik, for relator.

Michael DeWine, Attorney General, and Jeanna R. Volp and Stephen D. Plymale, Assistant Attorneys General, for respondent Industrial Commission of Ohio.

Taft Stettinius & Hollister, L.L.P., Timothy L. Zix, and Kristi J. Kmetz, for respondent BP America, Inc.

———————

TYACK, Judge.

{¶ 1} Annette George has filed this action in mandamus, seeking a writ to compel the Industrial Commission of Ohio to grant her temporary total disability ("TTD") compensation.

{¶ 2} In accord with Loc.R. 12, this case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision, which contains detailed findings of fact and conclusions of law and is appended to this decision. The magistrate's decision includes a recommendation that we deny the request for a writ.

{¶ 3} Counsel for George has filed objections to the magistrate's decision. Counsel for the commission has filed a memorandum in response. Counsel for BP America, Inc. ("BP"), her employer at the time of her injuries, has also filed a memorandum in response. This case is now before this court for a full, independent review.

{¶ 4} George slipped on a pile of snow while performing duties for BP at a service station. The slip occurred on January 30, 2009. George had prior injuries to both of her knees. George claimed initially that she had aggravated a former injury to her right knee, which she believed had a torn anterior cruciate ligament ("ACL").

{¶ 5} Cyril E. Marshall, M.D., her primary treating physician, diagnosed her conditions as right knee instability and right knee sprain. She was also diagnosed as having laxity, or the tendency for a joint or ligament to move when force is applied to it.

{¶ 6} A staff hearing officer eventually recognized the condition of "right knee sprain" after BP resisted the recognition of any new conditions at all.

{¶ 7} George was seen by William R. Bohl, M.D., at the request of BP for an independent medical exam. The commission relied upon Dr. Bohl's reports in deciding that George was not entitled to TTD compensation. In this mandamus

action, counsel for George argues that those reports are equivocal and not of sufficient evidentiary value to support the commission's finding.

{¶ 8} Counsel for George lists three specific objections:

The Magistrate erroneously denied Ms. George's request for a writ of mandamus, finding that that [sic] medical reports of Dr. Bohl are not equivocal and, therefore, are competent evidence upon which the Commission could have relied to deny Claimant's application for Temporary Total Disability.

The Magistrate erred by not addressing the FACT that Respondent BP America intentionally delayed certifying Ms. George's claim thereby preventing her from being able to receive treatment, and then denying temporary total disability for the same period as Ms. George was not actively treating.

The Magistrate erred by finding that the "instability" in Ms. George's knee was a distinct allowable medical condition rather than a symptom which needed to be additionally allowed in her claim prior to her being entitled to receive temporary total disability.

{¶ 9} Although BP has fought recognition of any condition at all as a result of George's fall in January 2009, the claim has now been recognized administratively for at least right knee sprain. George sprained her knee when she fell. She was working before the fall, and now she is not working. BP, by fighting recognition of her new injury, has slowed her ability to get the diagnostic tests and treatment needed to help her recover from the fall. However, this delay does not equate to entitlement to TTD compensation. The delay could lengthen the time for which George receives TTD compensation, but is not an independent ground for granting or denying TTD compensation. The second objection to the magistrate's decision is overruled.

{¶ 10} The situation regarding George's entitlement to TTD compensation is complicated by a report of a radiologist as the result of an MRI, which the radiologist viewed as evidencing no ACL tear. At one point, Dr. Bohl seemed certain that George had suffered an ACL tear during the 2007 fall (not the 2009 fall). This led to his concluding that her current inability to work was a result of the 2007 injury, not the 2009 injury. Dr. Bohl simply disagrees with the findings of this MRI. If the MRI report is correct, Dr. Bohl's diagnosis is wrong.

{¶ 11} Dr. Marshall, George's primary treating physician, viewed her inability to work as the result of right knee sprain and resulting right knee instability. These are not separate conditions. The sprain made it necessary to wear a knee brace, which resulted in weakness to her right thigh. The weakness in her right thigh caused right knee instability or an increase in right knee instability. The view of the staff hearing officer ("SHO") that Dr. Marshall's reports relied on a nonrecognized condition is not warranted. Dr. Marshall's reports should not

have been discounted and could constitute some evidence to support an award of TTD compensation.

{¶ 12} Dr. Marshall's reports correspond to a portion of one of Dr. Bohl's reports, which stated:

> The sprain to the knee on 01/30/2009 may have caused additional tearing of the partial tear of the anterior cruciate ligament and definitely caused some tearing of ligamentous structures around the knee causing the pain and swelling following that injury. This resulted in the subsequent moderate amount of right thigh atrophy. At the present time it is that right thigh atrophy and weakness in the leg that has caused her patellar malaignment and previous laxity from her prior anterior cruciate ligament injury to become more symptomatic than it would otherwise be. She will probably continue to experience the sensation of instability with accompanying pain at least until those weakened muscles can be rehabilitated with physical therapy.

{¶ 13} Under the circumstances, Dr. Bohl cannot really be seen as reporting that George's right knee sprain was ever resolved and therefore not a cause of her inability to work. If other portions of his reports can be construed to state in that manner, then the reports are equivocal. The swelling may have subsided, and some of George's pain may have been lessened, but the thigh's atrophy that resulted from the sprain remained and made work at a BP station impossible, even according to Dr. Bohl's report set forth above.

{¶ 14} In technical terms, Dr. Bohl's reports, taken together, do not constitute some evidence to support the commission's denial of TTD compensation based upon her 2009 fall.

{¶ 15} The first objection to the magistrate's decision is sustained.

{¶ 16} As to the third objection, we have observed that George's current knee instability is the result of the treatment for her right knee sprain. To the extent that the magistrate's decision could be viewed as stating otherwise, the objection is sustained.

{¶ 17} In summary, we sustain the first and third objections to the magistrate's decision. We overrule the second objection. As a result, we grant a writ of mandamus compelling the commission to vacate its orders denying TTD compensation for George. The commission shall conduct further proceedings to determine if Annette George is entitled to TTD compensation without relying on the reports of Dr. Bohl.

> Objections sustained in part
> and overruled in part;
> writ granted.

CONNOR, J., concurs.

BRYANT, P.J., concurs in part and dissents in part.

BRYANT, Presiding Judge, concurring in part and dissenting in part.

{¶ 18} Being unable to fully agree with the majority opinion, I respectfully dissent, in part.

{¶ 19} Initially, I agree with the majority's disposition of the second objection to the magistrate's decision. Although relator's tests and treatment may have been delayed when BP disputed relator's claim for right knee sprain, that delay does not in itself entitle relator to temporary total disability compensation.

{¶ 20} I, however, disagree with the majority's resolution of the first and third objections. For the reasons set forth in the magistrate's decision, the medical reports of Dr. Bohl are not equivocal, and the commission could rely on them. To the extent that the commission found them credible and persuasive, we may not substitute our judgment for that of the commission, including determining whether the radiologist who read the September 2009 MRI was correct in interpreting the MRI.

{¶ 21} Lastly, relator's third objection raises the issue whether the instability she experienced is a separate claim for which she must seek allowance or a symptom of the allowed condition of right knee sprain. In that regard, relator's treating physician, Cyril E. Marshall, M.D., diagnosed relator as suffering from two conditions, for which he provided ICD–9 codes: "718.86 [right] knee instability [and] 844.9 [right] knee sprain." Similarly, relator must have sought to have the commission include instability among the allowed conditions, as the district hearing officer's August 27, 2009 order specifies that "Injured Worker's request for the allowance of instability of the right knee was withdrawn prior to hearing by Injured Worker's counsel and is therefore dismissed." Both suggest that the instability is a separate claim, not a symptom of the allowed claim of right knee sprain.

{¶ 22} More significantly, Dr. Bohl's June 3, 2009 report, on which the commission relied, opined that anterolateral rotatory instability such as relator experienced usually is "due to an injury either a complete or partial tear of the anterior cruciate ligament in [the right] knee." In relator's case, Dr. Bohl concluded that "it is probably entirely due to the anterior cruciate ligament injury," the allowed claim in her 2007 injury. His subsequent November 2009 report appears to confirm his original opinion. Dr. Bohl's reports thus provide some evidence for the staff hearing officer's conclusion that the request for compensation was not "attributable to the allowed 'sprain right knee.' "

{¶ 23} Subsequent to this hearing, relator's claims apparently were additionally allowed for substantial aggravation of preexisting interior cruciate ligament tear of the right knee, a decision arguably supported in Dr. Bohl's reports; and relator may seek temporary total disability compensation for the newly allowed claim. The new claim, however, was not allowed at the time the commission rendered its decision at issue here, and Dr. Bohl's reports do not support temporary total disability compensation for the right knee sprain alone.

{¶ 24} I cannot conclude that the commission abused its discretion in denying temporary total disability compensation. Accordingly, I dissent from that aspect of the majority opinion.

## APPENDIX

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

The State of Ohio ex rel. George,

v.

Industrial Commission of Ohio et al.

No. 10AP–310

### MAGISTRATE'S DECISION

Rendered on March 14, 2011

### IN MANDAMUS

{¶ 25} Relator, Annette George, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which denied her temporary total disability ("TTD") compensation and ordering the commission to find that she is entitled to that compensation.

*Findings of Fact:*

{¶ 26} 1. Relator sustained a work-related injury on January 30, 2009 when she slipped while climbing on a snow pile to change the gasoline price sign.

{¶ 27} 2. Respondent BP America, Inc. ("employer") contested the claim because relator had previously sustained an injury to her left knee in 2004 and had sustained a significant injury to her right knee in 2007.

{¶ 28} 3. Regarding the 2004 injury to relator's left knee, progress notes from June 21, 2004 show that relator had nearly identical symptoms in both her right and left knees at that time including: –10 to 135 degrees; no effusion; mild posterior/lateral joint line tenderness; negative anterior/posterior drawer; nega-

tive McMurray/Lachman; 5 millimeters medial/lateral laxity; minimal crepitus; and tender to palpation medial/lateral patellar facet. Regarding the right knee only, the progress notes indicate mild posterial/lateral joint line tenderness.

{¶ 29} 4. With regard to her 2007 right knee injury, the following evidence is in the stipulated record: (a) hospital records from Huron Hospital dated January 20, 2007 indicate that relator presented at the hospital with pain in her right knee after a fall when she heard a pop and her kneecap appeared to go sideways. Relator had decreased range of motion and pain. According to the hospital records, she was wearing a knee immobilizer and utilizing crutches. Relator was discharged the same day; (b) relator was again seen at Huron Hospital for follow-up visits on January 25, February 8, and February 22, 2007. Relator's prescription for pain medication was renewed. The hospital records indicate that the x-ray showed ACL/MCL tear (anterior cruciate ligament/medial collateral ligament); (c) on March 29, 2007, relator saw Joseph K. Daprano, M.D., who indicated that the hospital x-rays were normal, but the MRI showed torn medial meniscus and medial collateral ligament and anterior "collateral" ligament. He noted that relator's pain was high and she wanted a second opinion at that time. The exam findings for relator's right knee were normal without evidence of erythema, warmth, or discoloration and that active and passive range of motion was full. However, his impression was that relator had sustained an ACL/MCL tear and referred her to an orthopedic specialist; (d) relator was seen by Dr. Brendan M. Patterson on April 16, 2007. At that visit it was noted that relator ambulated with the aid of crutches and a knee immobilizer. It was indicated that the MRI findings showed an ACL tear and a small posterior medial meniscus tear. Her right knee was swollen and stiff; (e) relator participated in physical therapy on May 11, 2007. At that time it was noted that relator's pain level was seven of ten, the sensation was burning and grinding, her knee would give way, and her pain was increased by climbing stairs, going down stairs, and ambulating. The plan was to see relator two times per week for five weeks; and (f) relator was seen by Mark D. Jenkins, M.D., on June 4, 2007. Dr. Jenkins noted that relator continued to have persistent stiffness since therapy. Dr. Jenkins noted that relator may benefit from knee arthroscopy.

{¶ 30} 5. Returning to the 2009 injury, the record contains a letter from relator dated January 31, 2009 wherein she explains to her employer how she was injured and indicated:

While climbing the 4ft snow mound in front of our sign I sank almost thigh high in the snow causing aggravation to my right knee which has the torn ACL. * * *

{¶ 31} 6. On March 5, 2009, relator completed a first report of an injury, occupational disease or death form. Her physician, Cyril E. Marshall, M.D.,

diagnosed the following conditions: "718.86 [right] knee instability [and] 844.9 [right] knee sprain." At the same time, Dr. Marshall completed a C–84 certifying that relator was temporarily and totally disabled from March 5, 2009 through an estimated return-to-work date of April 15, 2009 due to the conditions of right knee instability and right knee sprain.[1] In his office notes, Dr. Marshall noted relator's prior right knee injury and indicated that surgery had not been performed at that time.

{¶ 32} 7. The next office note from Dr. Marshall, dated August 31, 2009, indicates that relator continued to have pain and instability and again referenced her 2007 injury noting that, at the time, it was considered a partial tear.

{¶ 33} 8. Relator was next seen by Dr. Marshall on September 30, 2009. He indicated that relator continued with right knee instability and noted that the MRI showed a fracture of the lateral tibial plateau. Dr. Marshall also described that relator had a certain amount of laxity.[2]

{¶ 34} 9. Relator saw Dr. Marshall again on November 5 and December 17, 2009, and he noted that relator continued with pain in her right knee and walked with a marked limp.

{¶ 35} 10. Dr. Marshall next saw relator on January 25, 2010. In that office note, Dr. Marshall indicated that he was going to file a C–9 for surgical consultation and, because the MRIs were somewhat inconclusive, he recommended arthroscopic surgery so that a visual evaluation of the ACL could be made.

{¶ 36} 11. An independent medical evaluation was performed by William R. Bohl, M.D., on June 3, 2009. Dr. Bohl examined relator for the purpose of determining if she sustained an injury to her right knee and, if so, what injuries she sustained. In his report of the same date, Dr. Bohl provided a history, both of relator's 2007 knee injury as well as the 2009 knee injury. Dr. Bohl provided his physical findings on examination and noted that relator immensely has an antalgic gait on the right side, that she was unable to toe walk on that side, but that she had no trouble heel walking. Dr. Bohl then examined relator's left knee in order to obtain a baseline. With regard to both the left and right knees, Dr. Bohl noted the same findings: a small amount of tenderness under both patellar facets, more on the right; a small degree of patellar crepitus; the same degree of lateral opening with varus stress in both knees was observed and similar anterior drawer signs in both knees. Dr. Bohl noted the following findings related solely

---

1. Both sprain and strain are used in the various reports, as well as in the commissions' orders.

2. Laxity: "The amount a joint or ligament deviates from its initial position when a force is applied to it." Taber's Cyclopedic Medical Dictionary (20th ed. 2005).

to the right knee: relator's McMurray sign was negative;[3] he also noticed that relator had "1–2 +" posterolateral rotatory instability in the right knee[4] as well a "one-and-a-quarter" inch of thigh atrophy in the right thigh. Dr. Bohl noted:

The current state of Ms. George's right knee is that she has varus instability or lateral laxity similar to the opposite knee both of which appeared to be a physiologic variant with much greater than the normal varus laxity. She also has mild-to-moderate bilateral patellar malalignments, also congenital in nature. She has a degree of anterolateral rotatory instability of the right knee which distinguishes it from the opposite knee. This is usually due to an injury either a complete or partial tear of the anterior cruciate ligament in that knee and sometimes stretching posterolateral capsule but in this case where the capsule is already so lax it is probably entirely due to the anterior cruciate ligament injury.

{¶ 37} Regarding the 2007 MRI, Dr. Bohl's review of records, which did not include a copy of the 2007 MRI, led him to believe that relator had a torn medial meniscus, torn medial collateral ligament, and anterior cruciate ligament of the right knee. He noted further that relator had a positive McMurray's sign and was treated conservatively. Thereafter, Dr. Bohl was asked the following three questions, his response being provided under each one:

[One] Did Ms. George suffer a right knee sprain (844.9) on 01/30/09 while working for BP America. Please explain your reasoning behind your opinion. Yes, she did sustain a right knee sprain. The extension twisting injury to her knee resulting in pain and swelling in her right knee which appears to have subsequently resolved.

[Two] Did Ms. George suffer from right knee instability (718.86)? If yes, is her right knee instability a direct and proximate result of her job duties as cashier on 01/30/09? Please explain your reasoning behind your opinion.

Ms. George does suffer from right knee instability. She actually has three types of instability[.] One is the instability resulting from a right patellar malalignment in the presense [sic] of right thigh atrophy, the second is a longstanding varus instability from ligamentous laxity she has congenitally in both knees, and the third is a result of a partial or complete tear of the anterior

---

3. McMurray test: "A test for a torn meniscus of the knee. The examiner flexes the patient's knee completely, rotates the tibia outward, and applies a valgus force against the knee while slowly extending it. A painful click indicates a torn medial meniscus. If a click is felt when the tibia is rotated inward and a varus force is applied against the knee during extension, the lateral meniscus is torn." Taber's.

4. In his report, Dr. Bohl inadvertently referenced relator's left knee when, in fact, he meant her right knee. This error was acknowledged by Dr. Marshall and corrected in a later report.

cruciate ligament in the right knee. The congenital lateral laxity is not the result of her 01/30/09 injury as this is bilateral and equal. From the past records, there is good evidence from an MRI that Ms. George suffered a prior ligamentous injury to her anterior cruciate ligament which would be expected to result in some degree of anterior drawer and the anterior lateral rotatory instability noted on her exam. To the extent that this preexisted the 01/30/09 injury this would also not be the result of that injury. The sprain to the knee on 01/30/2009 may have caused additional tearing of the partial tear of the anterior cruciate ligament and definitely caused some tearing of ligamentous structures around the knee causing the pain and swelling following that injury. This resulted in the subsequent moderate amount of right thigh atrophy. At the present time it is that right thigh atrophy and weakness in the leg that has caused her patellar malalignment and previous laxity from her prior anterior cruciate ligament injury to become more symptomatic than it would otherwise be. She will probably continue to experience the sensation of instability with accompanying pain at least until those weakened muscles can be rehabilitated with physical therapy.

[Three] Do the related conditions, if any, prevent Ms. George from performing her regular work duties? If yes, please identify her current physical capabilities and specify what limitations if any she has due to this condition.

Her current condition renders her able only to perform sedentary occupations. I am presuming that her regular work duties also involved other duties. Any walking at this point would require a cane or some other orthotic device to prevent her leg from giving out on her and would prevent bending, squatting or climbing and probably any prolonged walking or standing.

{¶ 38} 12. Dr. Bohl authored a second report, dated August 24, 2009, wherein he corrected the typographical error noted in the above finding of fact. Based on additional medical records which Dr. Bohl was provided at this time, he noted as follows:

With regards to the conclusions and opinions in my original medical report the one change I would make based on the additional records you provided would be under the second question, "Did Ms. George suffer from right knee instability (718.86) if yes, is her right knee instability a direct and proximal result of her job duties as cashier on 01/30/09. Please explain the reason behind your opinion?" The change I would make is in line 10 of the following paragraph where I had originally stated "the sprain to the knee on 01/30/09 may have caused additional tearing of the partial tear of the anterior cruciate ligament". I would no longer state that it caused additional tearing to the partial tear of the anterior cruciate ligament, since it appears that this anterior

cruciate ligament tear was already complete, so there could be no additional tearing. The remainder of my opinions would remain the same.

{¶ 39} 13. Dr. Marshall continued to certify TTD through an estimated return-to-work date of December 21, 2009.

{¶ 40} 14. On August 27, 2009, relator's claim was heard before a district hearing officer ("DHO"). As noted previously, the employer contested the claim. The DHO specifically noted that: "Injured Worker's request for the allowance of instability of the right knee was withdrawn prior to hearing by Injured Worker's counsel and is therefore dismissed." Thereafter, the DHO allowed relator's claim for "right knee strain." The order was based on the medical records from Huron Hospital and Dr. Marshall as well as Dr. Bohl's June 3 and August 24, 2009 reports. At that time, the DHO indicated that the request for TTD compensation would be considered upon submission of proof.

{¶ 41} 15. Another MRI was performed on September 18, 2009. The radiologist interpreted the MRI as revealing the following:

FINDINGS: The posterior horn of the medial meniscus is somewhat thin but there is no frank articular surface tear identified.

Normal lateral meniscus.

* * *

Normal lateral collateral ligament.

* * *

Normal anterior cruciate ligament.

Normal posterior cruciate ligament.

* * *

There is bone marrow edema of the posterior aspect of the lateral tibial plateau. On the coronal images there appears to be slight depression of the articular surface. The finding strongly suggests a slightly depressed tibial plateau fracture. Correlation with plain films and/or CT should be considered. The radiologist concluded as follows:

IMPRESSION: Findings suggest a minimally depressed lateral tibial plateau fracture. Plain film and/or CT correlation is recommended.

Intrasubstance signal changes and thinning of the medial meniscus consistent with meniscal degeneration.

No frank tear is seen.

{¶ 42} Dr. Marshall responded to Dr. Bohl's June 3 and August 24, 2009 reports in a report dated September 29, 2009. Dr. Marshall specifically indicated how, in his opinion, Dr. Bohl's reports supported his findings and conclusions:

In summary, the recent MRI confirms that the patient'[s] current exam findings, that are supported as right knee sprain and right knee instability (on my exam and Dr. Bohl's), in no way relates to an old ACL injury. She had a prior injury to the right knee in 2007 that was treated conservatively with full resolution prior to this 1–30–09 injury. She has no structural ACL damage at this time. She did suffer a sprain injury to her right knee on 1–30–09, which is not disputed in any of the medical. The sprain was severe and there is ligamentous instability related to the sprain. She is not capable of performing her job duties at this time, as the right knee condition is disabling. Now that we have the MRI, we can go forward with the physical therapy she requires from this injury, as Dr. Bohl explained, therapy is necessary for strengthening. [Independent Medical Examination] did attribute the need for strengthening directly to this 1–30–09 injury. IME explained that this injury resulted in a moderate amount of right thigh atrophy. The patient needs a strengthening plan. Again, I need to see the MRI films; however, it is plain from the report that her present right knee condition in no way relates to a prior ACL injury that had resolved by the time this accident occurred.

She is disabled at this time because of this injury. It is my medical opinion, within reasonable certainty, the right knee sprain with resulting instability is supported in the medical as directly related to the 1–30–09 injury at work.

{¶ 43} 17. Dr. Bohl authored another report, dated September 29, 2009, apparently in response to a question posed to him as to whether the sole related condition of right knee sprain was preventing relator from performing her regular job duties. Dr. Bohl responded that it was not:

* * * Upon reviewing the records provided to me and my own notes regarding the claimant's injuries[,] it would be my opinion that the right knee sprain referred to which was a sprain of the right medial collateral ligament would have healed by this time and is not the sole condition preventing Ms. George from performing her regular job duties. The conditions currently preventing her from performing her regular job duties are the instability of the knee from her preexisting complete tear of the anterior cruciate ligament plus the recurrent giving way of her knee due to a right patellar malalignment in the presence of right thigh atrophy.

{¶ 44} 18. Dr. Marshall authored another report, dated October 2, 2009, in response to Dr. Bohl's September 29, 2009 report. In that report, Dr. Marshall specifically referenced the September 18, 2009 MRI. Dr. Marshall stated:

We have the benefit of the 9–18–09 MRI, which refutes the opinion that the current right knee status relates to a preexisting ACL tear. The patient's ACL is normal. This was explained in my 9–29–09 report[.] She does have verified instability of the knee relating directly to this 1–30–09 sprain. Dr.

Bohl, in his 6–3–09 independent medical report explained that the right thigh atrophy that is present relates to this 1–30–09 injury. He explained that the swelling and pain in the right knee following this accident resulted in a moderate amount thigh atrophy. I attribute the thigh atrophy to the need for knee immobilizer and bracing since this injury occurred. Both opinions support thigh atrophy resulted from this sprain injury. With atrophy there is weakness. The opinion that this injury caused the previous ACL tear to become more symptomatic is refuted by the recent MRI.

The patient suffered a severe sprain of the right knee on 1–30–09 with associated instability—verified in the entire medical. She has developed right thigh atrophy relating directly to this accident—as explained on IME. Atrophy has developed because of the continuous need for right knee stabilization following this accident.

Her inability to work at present is solely due to this injury. She needs physical therapy to strengthen the right knee, also explained on the IME. Therapy was on hold until the MRI results were received. As you know, we had to wait for the Industrial Commission to approve that MRI.

She is not able to return to her job at this time because of this injury and need for treatment. She was not having problems with her knee when this injury occurred. MRI confirms her current right knee impairment does not relate to a preexisting ACL injury.

{¶ 45} 19. The question of whether or not relator's claim would be allowed at all was heard before a staff hearing officer ("SHO") on October 6, 2009. The SHO modified the prior DHO order, allowed the claim for "sprain right knee" based on the narrative reports of Dr. Bohl.

{¶ 46} 20. The employer's appeal was refused by order of the commission mailed October 30, 2009.

{¶ 47} 21. Dr. Bohl was provided with the hospital films from Huron Hospital as well as the 2007 and 2009 MRIs. In a letter dated November 2, 2009, Dr. Bohl explained how his review of this evidence, previously not seen by him, did not change his opinion:

At your request I have reviewed the hospital films from Huron Road Hospital dated 01/20/07, MRI films dated 02/02/07 and MRI films dated 09/18/09 all on claimant, Annette George. The diagnosis of whether or not an anterior cruciate ligament is present is based on the ability to see that on one of the cuts which the MRI consists of. Since an MRI is a series of cuts through the knee it is possible for it to completely miss an intact ACL if the cuts are wide enough. In this case apparently the ACL was diagnosed as showing a complete tear on the 2007 film and being intact on the 2009 film. I have

reviewed these MRIs myself for the first time. The MRI dated 02/02/07 which was then interpreted as showing a complete disruption of the anterior cruciate ligament in fact does not appear to show that. It does however show an area of apparent hemorrhage and partial tearing which appears to be in the anterior part of that ligament. Such an injury could allow subsequent disruption of the ligament more easily than normal or it could completely heal. This means it is possible that Ms. Annette George subsequently had a normal or near normal anterior cruciate ligament. On my review of the more recent MRI dated 09/18/09 which is interpreted as showing a normal ACL I have reviewed all of the sections provided in the folder and do not see on any of them with what I would call a normal intact ACL. In fact I only see one slice that looks like it could even be interpreted as showing fibers of the anterior cruciate ligament and that area does not appear normal. It might be useful to have a new radiologist, hopefully one that had some expertise in reading MRIs of the knee, go over both sets of films simultaneously and give his opinion. These incompatible of readings and the finding of what does not appear to be a complete tear of the ACL on the first film do cloud the issue somewhat. I assume that Dr. Curtis Smith would not have been anticipating an ACL reconstruction had Ms. George's injury not been accompanied by the appropriate degree of ligamentous laxity in that knee, indicating a probable additional failure of what appears to be on the MRI a partial tear of the anterior cruciate ligament on the 2007 film. An intact ACL can become attenutated [sic] to the point it is no longer functional and give the same disability as a completely ruptured one. That would mean that my original opinion regarding a pre-existing laxity is probably correct. I would be interested in hearing the opinion of a radiologist who does look at both films simultaneously as to what he sees there.

{¶ 48} 22. In response to Dr. Bohl's November 2, 2009 letter, Dr. Marshall authored the following letter dated November 20, 2009:

Per my exams and the 11–2–09 letter from Dr. Bohl, it is apparent Annette George has a significant right knee sprain and a clear need for treatment. The Industrial claim allowance was appealed twice. We had to wait for the appeal process to conclude, and an approval for treatment was just recently received. The right knee sprain is severe and disabling at present. Her job description with B.P. Oil is not sedentary, as evidenced by the mechanism of injury on 1–30–09. The medical records explain that she has a severe right knee sprain. She requires treatment to restore function.

She is not at a level of maximum-medical improvement. She is not capable of working at this time because of this injury.

{¶ 49} 23. The matter of TTD compensation was heard before a DHO on November 20, 2009 and was denied as follows:

Temporary total disability compensation from 03/05/2009 through 11/20/2009 is denied. There is insufficient medical evidence in the state file to indicate that the Injured Worker is temporarily and totally disabled due to the allowed knee sprain in this claim. There are two office notes in file from Dr. Marshall. They are dated 03/05/2009 and 08/31/2009. Both of those office notes indicate pain and instability in the right knee. The 03/13/2009 C–84 completed by Dr. Marshall list[s] right knee instability as one of the disabling conditions in this claim. Temporary total disability compensation from 03/05/2009 through 08/30/2009 is denied because Dr. Marshall only saw the Injured Worker once during this period, on 03/05/2009, and specifically indicated that right knee instability was one of the Injured Worker's disabling conditions. Temporary total disability compensation from 08/31/2009 to date is denied based on the 06/03/2009 and 11/02/2009 reports of Dr. Bohf [sic].

{¶ 50} 24. Dr. Marshall authored another report, dated December 4, 2009, wherein he again stresses that the allowed conditions in relator's claim are preventing her from working at this time.

{¶ 51} 25. Relator's appeal from the DHO order was heard before an SHO on January 20, 2010. The SHO modified the prior DHO order, yet denied TTD compensation as follows:

Staff Hearing Officer denies the request for temporary total disability compensation from 03/05/2009 to date as not being attributable to the allowed "sprain right knee". This order is made based on the 06/03/2009 and 11/02/2009 reports and opinions of Dr. Bohl.

{¶ 52} 26. Relator's subsequent appeal was refused by order of the commission mailed February 13, 2010.

{¶ 53} 27. Thereafter, relator filed the instant mandamus action in this court.

*Conclusions of Law:*

{¶ 54} Relator argues that the commission abused its discretion by denying her TTD compensation based upon a finding that her disability was not attributable to the allowed condition of right knee sprain. Specifically, relator contends that the reports of Dr. Bohl upon which the commission relied do not constitute "some evidence" because they are equivocal, contradictory and uncertain. Relator also argues that the commission abused its discretion by refusing further appeal from the SHO's order.

{¶ 55} The commission argues that Dr. Bohl's reports are not inconsistent, equivocal or ambiguous, but that each report simply reflects his opinion based on the evidence before him at that particular time. Further, the commission asserts that relator's evidence was not sufficient to support an award of TTD compensa-

tion and that the commission did not abuse its discretion by refusing relator's appeal.

{¶ 56} The magistrate finds that the commission did not abuse its discretion. While Dr. Bohl's reports may appear equivocal or contradictory, a thorough review of those reports indicates that Dr. Bohl modified or clarified earlier statements after he received medical evidence that his original underlying assumptions were incorrect.

{¶ 57} TTD compensation awarded pursuant to R.C. 4123.56 has been defined as compensation for wages lost where a claimant's injury prevents a return to the former position of employment. Upon that predicate, TTD compensation shall be paid to a claimant until one of four things occurs: (1) claimant has returned to work; (2) claimant's treating physician has made a written statement that claimant is able to return to the former position of employment; (3) when work within the physical capabilities of claimant is made available by the employer or another employer; or (4) claimant has reached maximum medical improvement. See R.C. 4123.56(A); *State ex rel. Ramirez v. Indus. Comm.* (1982), 69 Ohio St.2d 630, 23 O.O.3d 518, 433 N.E.2d 586.

{¶ 58} An injured worker can only be awarded TTD compensation if the inability to return to work is caused by an allowed condition. When there are nonallowed conditions present, the injured worker is required to show that the allowed condition independently caused the disability. *State ex rel. Bradley v. Indus. Comm.,* 77 Ohio St.3d 239, 1997-Ohio-48, 673 N.E.2d 1275.

{¶ 59} In the present case, the fact that relator had a prior significant injury to her right knee is undisputed. It was incumbent upon relator to present medical evidence demonstrating that the allowed condition of right knee sprain independently caused her disability. In support of her request, several C–84s, four of which are contained in the stipulation of evidence, were presented. On March 5, 2009, Dr. Marshall certified relator as being disabled from March 5 through April 15, 2009. A review of that C–84 indicates that Dr. Marshall opined that instability of right knee and right knee sprain were the conditions being treated and which were preventing relator from returning to work. To the extent that Dr. Marshall failed to attribute her disability solely to the allowed condition of right knee sprain, the commission, by indicating that relator did not meet her burden of proof and denying her TTD compensation through April 15, 2009, did not rely on this evidence. Because Dr. Marshall attributed this period of disability in part to a nonallowed condition, this C–84 did not constitute some evidence.

{¶ 60} The remaining three C–84s in the record properly listed only the allowed condition of right knee sprain as the condition causing relator's disability.

As such, the remaining three C–84s completed by Dr. Marshall could constitute some evidence supporting an award of TTD compensation from April 16, 2009 through March 17, 2010. Relator also submitted office notes from Dr. Marshall beginning with the first visit on March 5, 2009. The next office note is dated August 31, 2009. To the extent that relator did not demonstrate that she was receiving treatment for the allowed condition from March 5 through August 30, 2009, the commission could have denied this period of compensation as well. As the Supreme Court of Ohio stated in *State ex rel. Simon v. Indus. Comm.* (1994), 71 Ohio St.3d 186, 188, 642 N.E.2d 1096, "While a lack of treatment may not always equate to a lack of disability, it can, * * * equate to a lack of proof thereof." As such, to the extent that the commission and the employer continue to argue that relator's evidence did not support a finding that she was entitled to TTD compensation, respondents are correct to point out that relator's medical evidence was arguably insufficient to support the payment of TTD compensation from March 5 through August 30, 2009 leaving the following relevant period at issue: whether the commission abused its discretion by denying TTD compensation from August 31, 2009 through March 17, 2010.

{¶ 61} The commission relied on two pieces of evidence to deny relator's request for TTD compensation beginning March 5, 2009. The commission relied on the reports of Dr. Bohl, the first dated June 3, 2009 and the second dated November 2, 2009. Relator argues that, not only do those two reports not constitute some evidence upon which the commission could rely, but that when read in combination with Dr. Bohl's other two reports (August 24 and September 29, 2009), those reports clearly do not constitute some evidence upon which the commission could rely.

{¶ 62} Dr. Bohl's June 3, 2009 report was written at a time when relator's claim was being contested by the employer. At that time, relator was arguing that two conditions should be allowed: right knee sprain and right knee instability. Dr. Bohl was asked to determine whether or not the work-related injury caused relator to suffer from either or both a right knee sprain and right knee instability. In his June 3, 2009 report, Dr. Bohl clearly opined that relator did sustain a right knee sprain: "Yes, she did sustain a right knee sprain. The extension twisting injury to her knee resulting in pain and swelling in her right knee which appears to have subsequently resolved."

{¶ 63} With regard to whether or not the condition of right knee instability was also caused by the January 30, 2009 injury, his opinion is not nearly as clear. Dr. Bohl opined that relator had three types of instability in her right knee: (1) "[o]ne is the instability resulting from a right patellar malalignment in the presense [sic] of right thigh atrophy"; (2) "a longstanding varus instability from ligamentous laxity she has congenitally in both knees"; and (3) "a result of a

partial or complete tear of the anterior cruciate ligament in the right knee." Thereafter, Dr. Bohl indicated that neither (2) nor (3) were caused by the work-related injury. Dr. Bohl stated:

> * * * The congenital lateral laxity is not the result of her 01/30/09 injury as this is bilateral and equal. From the past records, there is good evidence from an MRI that Ms. George suffered a prior ligamentous injury to her anterior cruciate ligament which would be expected to result in some degree of anterior drawer and the anterior lateral rotatory instability noted on her exam. To the extent that this preexisted the 01/30/09 injury this would also not be the result of that injury. * * *

{¶ 64} Dr. Bohl summarized his conclusion as follows:

> * * * The sprain to the knee on 01/30/2009 may have caused additional tearing of the partial tear of the anterior cruciate ligament and definitely caused some tearing of ligamentous structures around the knee causing the pain and swelling following that injury. This resulted in the subsequent moderate amount of right thigh atrophy. At the present time it is that right thigh atrophy and weakness in the leg that has caused her patellar malalignment and previous laxity from her prior anterior cruciate ligament injury to become more symptomatic than it would otherwise be. She will probably continue to experience the sensation of instability with accompanying pain at least until those weakened muscles can be rehabilitated with physical therapy.

{¶ 65} After breaking his report down into six sections, this much is clear: (1) Dr. Bohl opined that relator did sustain a right knee sprain; however, he concluded that the sprain had subsequently resolved; (2) Dr. Bohl opined that relator had right knee instability caused by right patellar malalignment in the presence of right thigh atrophy, long standing varus instability from ligamentous laxity congenitally in both knees, and as a result of a partial or complete tear of the anterior cruciate ligament in the right knee; (3) Dr. Bohl opined that the instability resulting from the congenital lateral laxity was not the result of the January 30, 2009 injury because it was bilateral and equal; (4) Dr. Bohl opined that, to the extent the tear to relator's anterior cruciate ligament preexisted the January 30, 2009 injury, this instability was also not the result of that injury; (5) Dr. Bohl opined that the right knee sprain may have caused additional tearing of the anterior cruciate ligament (2007 injury), and did cause some tearing of ligamentous structures around the knee causing the pain and swelling, as well as the subsequent moderate amount of right thigh atrophy; and (6) that the degree of relator's current instability was the right thigh atrophy and weakness in her leg which had caused her patellar malalignment and previous laxity from her prior anterior cruciate ligament injury to become more symptomatic and which required the strengthening of those weakened muscles through physical therapy.

{¶ 66} In the final analysis, Dr. Bohl opined that relator did suffer a right knee sprain, that the pain and swelling from that sprain had resolved, and that the right knee sprain aggravated the instability that relator had in her knee prior to the date of injury. So, while Dr. Bohl opined that relator no longer suffered from a right knee sprain, he did opine that the right knee sprain aggravated and exacerbated problems relator had which preexisted the work-related injury. Thereafter, Dr. Bohl opined that relator's current condition rendered her able to perform only sedentary work and that, presuming that her regular work duties involve walking, bending, squatting, or climbing, that she would not be able to perform that job.

{¶ 67} Relator argues that, because the right knee sprain caused her underlying instability to worsen and that the worsening of those preexisting conditions prevents her from returning to her former position of employment, that Dr. Bohl's report does not constitute some evidence upon which the commission could rely to deny her TTD compensation. For the reasons that follow, this magistrate disagrees.

{¶ 68} While Dr. Bohl did opine that relator's right knee sprain aggravated her right patellar malalignment, the congenital ligamentous laxity, and the instability resulting from the 2007 injury, relator's claim has not been allowed for aggravation of right patellar malalignment in the presence of right thigh atrophy, nor for congenital ligamentous laxity, nor for aggravation of the partial or complete tear of the anterior cruciate ligament. This is similar to a situation where a claimant has a preexisting injury to their back, perhaps a herniated disc. Following a work-related injury, the condition of that herniated disc worsens. The claimant's claim is not allowed for the condition of herniated disc, but is allowed for the aggravation of the herniated disc. As such, the magistrate finds that the June 3, 2009 report does support the commission's determination that relator's current disability is not caused by the right knee sprain in spite of the fact that Dr. Bohl opined that her disability was caused by instability in her right knee which was aggravated by the right knee sprain.

{¶ 69} The commission also relied on the November 2, 2009 report of Dr. Bohl. As indicated in his report, this was his first opportunity to actually review the MRI films. Apparently, prior to November 2, 2009, Dr. Bohl had access to the radiologists' interpretations of the 2007 and 2009 MRIs but did not have actual copies of the MRI films to review. After reviewing those films, Dr. Bohl opined that the 2007 MRI did not show a complete tear, but only showed a partial tear. This determination is critical because, at the time he authored his August 24, 2009 report, Dr. Bohl believed the tear to the anterior cruciate ligament had been complete and indicated that information would cause him to reword his June 3, 2009 report to no longer state that the right knee sprain caused additional tearing

to the partial tear of the anterior cruciate ligament. It also negates the statement he made in his September 29, 2009 report that relator was currently unable to perform her regular job duties due to the instability of her knee which resulted from the preexisting complete tear of the cruciate ligament plus the instability caused by the right patellar malalignment in the presence of right thigh atrophy. Presumably, the commission did not rely on these two reports because the opinions Dr. Bohl rendered in those reports were based on incorrect information.

{¶ 70} It is undisputed that equivocal medical opinions do not constitute some evidence as they have no probative value. *State ex rel. Eberhardt v. Flxible Corp.* (1994), 70 Ohio St.3d 649, 640 N.E.2d 815. Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Here, although relator argues that Dr. Bohl's reports are equivocal and ambiguous, the magistrate finds that nothing in the rule precludes a doctor from changing their opinion in the presence of additional medical evidence which they did not have before them to review previously. The extent of the damage caused to relator's ACL as a result of the 2007 injury was crucial to the determination of her current condition. To the extent that, at one time, Dr. Bohl believed the tear to be complete, it was incumbent upon him to reconsider his opinion in light of the evidence that the tear was only partial. This is not a reason to remove his reports from evidentiary consideration.

{¶ 71} In his November 2, 2009 report, Dr. Bohl also questioned the radiologist's interpretation of the 2009 MRI. As Dr. Bohl notes, the radiologist interpreted the MRI as showing a normal ACL. Upon his review, Dr. Bohl "[saw] one slice that looks like it could even be interpreted as showing fibers of the anterior cruciate ligament and that area does not appear normal." Dr. Bohl recommended that a new radiologist should review the MRI films and provide an opinion, his concern being that the MRI films and the radiologists' interpretations of those films appeared incompatible. For instance, Dr. Bohl wondered why Dr. Smith would have anticipated ACL reconstruction following the 2007 injury if relator's injury had not been accompanied by the appropriate degree of ligamentous laxity. And while Dr. Bohl did opine that an intact ACL could become attenuated to the point that it was no longer functional causing the same disability as a completely ruptured ACL, he also opined that his original opinion that relator suffered from preexisting laxity was "probably correct."

{¶ 72} As stated previously, the above statements do not render his reports equivocal, contradictory, uncertain, or ambiguous. Instead, those reports reflect his opinion in the presence of additional medical information. As such, the

magistrate finds that these two reports do constitute some evidence upon which the commission relied.

{¶ 73} Relator also contends that the commission abused its discretion by refusing further appeal. Relator contends that it is incumbent upon the commission to exercise its discretionary authority and grant an appeal from an SHO order where there is a clear mistake of fact. However, as indicated herein, the magistrate finds that there was not a clear mistake of fact regarding Dr. Bohl's reports. As such, the commission did not abuse its discretion when it denied her further appeal.

{¶ 74} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion when it denied her request for TTD compensation and this court should deny relator's request for a writ of mandamus.

/s/ *Stephanie Bisca Brooks*
STEPHANIE BISCA BROOKS
MAGISTRATE